UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)          No.     25 CR 636
v. )
)          Judge Georgia N. Alexakis
MARIMAR MARTINEZ, and )
ANTHONY RUIZ. )

**GOVERNMENT'S RESPONSE TO DEFENDANT MARTINEZ'S
MOTION FOR A PROMPT HEARING REGARDING
ALLEGED DESTRUCTION OF EVIDENCE**

The government respectfully submits this response to defendant Martinez's motion seeking a hearing regarding the alleged destruction of evidence, which (1) updates the Court on evidence regarding the Customs and Border Protection ("CBP") vehicle involved in a collision with vehicles driven by both defendants that has been gathered and produced in discovery since the parties' last appearance before the Court; and (2) explains why, in light of that evidence, a hearing regarding the handling and transport of the CBP vehicle is not warranted at this time.

I.     BACKGROUND

A. Criminal Charges

On October 9, 2025, a grand jury returned an indictment charging Marimar Martinez and Anthony Ruiz with, on or about October 4, 2025, having forcibly impeded, intimidated, and interfered with Border Patrol Agents from the U.S. Customs and Border Protection, while they were engaged in, and on account of, the performance of their official duties, and such acts involved a deadly and dangerous

1

weapon, namely, a motor vehicle, in violation of 18 U.S.C. § 111(a) and (b). R. 2 (Counts One and Two).

The events that led to the indictment included a collision between the defendants' cars and a CBP vehicle ("the CBP vehicle"), in which three CBP agents, including BPA 1[1] (the driver), were then riding in the area of 39th Place and Kedzie Avenue in Chicago.

**B. Defendant's Request for an Evidentiary Hearing Regarding the CBP Vehicle**

Defendant was arraigned on October 15, 2025, and the Court ordered a Rule 16.1(a) conference to be held by October 22, 2025. As defendant described in his motion, the government arranged for defense counsel to view the defendants' vehicles on October 17, 2025, but informed the defense that the CBP vehicle was no longer in FBI custody.

On October 19, 2025, defendant filed a motion seeking a prompt hearing regarding possible "destruction of evidence." R. 43. On October 20, 2025, the Court granted the motion for a hearing, without prejudice to the government's opportunity to respond to the motion following its production of discovery, and to argue that the need for the hearing has been obviated. R. 45.

Since the Court entered its order, the government has gathered additional evidence and made multiple pretrial disclosures to the defendants under Rule 16,

---

[1] BPA 1 works out of a CBP station in the state of Maine, and the subject CBP vehicle belongs to that station. The vehicle was assigned to BPA 1 for use in an official capacity and was driven to Chicago by BPA 1 for use during a 30-day detail in Chicago.

including FBI reports of interviews and attachments detailing the use and transport of, and the extent of the repairs made to, the CBP vehicle since October 4, 2025. The evidence gathered by the government and disclosed to the defense is summarized below. The government respectfully submits that, in light of the evidence disclosed since the Court entered its order on October 20, 2025, an evidentiary hearing regarding the transport and handling of the CBP vehicle is not warranted.

### C. The CBP Vehicle

Immediately after the defendants' vehicles fled the scene, the BPAs stood next to the CBP vehicle where it had stopped in the street after the collision. As a crowd began to gather in the area and traffic on Kedzie Avenue began to back up, BPA 1 moved the CBP vehicle and parked it on a sidewalk facing north on the west side of Kedzie Avenue. Thereafter, Chicago Police Department officers, other CBP agents, and agents of the FBI arrived at the scene. Upon their arrival, FBI agents conducted initial interviews, including of BPA 1. An FBI agent took approximately 12 photographs of the CBP vehicle involved in the incident, some of which were incorporated into the affidavit in support of the criminal complaint filed with the Court on October 5, 2025. BPA 1, accompanied by other CBP agents, then traveled to CBP's operation center to upload his body-worn camera and inventory the firearm he used during the incident.

Subsequently, members of the FBI's Evidence Response Team ("ERT") arrived at the scene and located the CBP vehicle where BPA 1 had left it on the sidewalk on

Kedzie Avenue.[2] An FBI ERT Agent took additional photographs of the scene, including approximately 8 more photographs of the exterior of the CBP vehicle. Thereafter, another FBI Special Agent drove the CBP vehicle to the FBI's Chicago Office for processing. The ERT inspected of the vehicle, took additional photographs of the vehicle and collected paint samples from the damaged areas. A supervisory FBI agent conferred with a supervisory AUSA and authorized the release of the CBP vehicle to CBP, without restrictions or any special instructions, once it had been processed and released by FBI's Evidence Response Team. On the evening of October 4, 2025, after FBI ERT had completed processing the vehicle and FBI released the vehicle to CBP, CBP arranged for BPA 1 to pick up the CBP vehicle from FBI's Chicago Office.

In the three days immediately following the FBI's return of the vehicle to him, BPA 1 used the vehicle only for travel in the Northern District of Illinois, including for travel back and forth between his overnight location and temporary base of operations in the Northern District of Illinois, as well as the Chicago federal courthouse on or about October 7, 2025, where he was interviewed by an FBI Special Agent and Assistant U.S. Attorneys. After this interview, BPA 1 made the CBP vehicle available to the FBI Special Agent and analysts from the Regional Computer

---

[2] The FBI ERT team also examined and transported to the FBI Office the vehicles driven by defendants Martinez and Ruiz. Those vehicles remain in FBI custody and have been made available to the defense for inspection. Those vehicles have remained undisturbed since the incident on October 4, 2025.

Forensics Laboratory so that they could download information from the CBP Vehicle's onboard computer.

BPA 1's temporary assignment in the Chicago area ended on October 7, 2025. He stayed an extra day to sit for the interview discussed above. On October 8, 2025, BPA 1 began the two-and-a-half-day drive back to his station in Maine in the CBP vehicle.[3] BPA 1 stated that he did not take any steps to wash, repair, or alter the exterior of the CBP vehicle between the time the vehicle was released to him by the FBI and the time he arrived at his station in Maine on October 10, 2025. Upon his arrival at the Maine CBP station, BPA 1 pulled the CBP vehicle into CBP's on-site garage, parked it, and retrieved his belongings. BPA 1 stated that he did not drive the CBP vehicle after October 10, 2025.

After the CBP vehicle arrived in Maine, the ranking supervisor of the Maine CBP station authorized its repair, understanding that the vehicle had been fully processed by the FBI and that, therefore, there was no further need to preserve the vehicle's condition as evidence. Pursuant to this authorization, on October 14, 2025, a CBP mechanic began to work on the car to put it back into service. At approximately 9:00 or 10:00 a.m., the mechanic used brake cleaner on a shop rag and attempted to wipe the scuff marks off the CBP vehicle. The mechanic stated that he used some pressure, as one would do waxing a car with a light circular motion. The mechanic did not repair any of scratches or dents on the vehicle. Pursuant to a

---

[3] The government has disclosed to defense counsel a Google Map of the route BPA 1 took, as well as receipts for the expenses he incurred along the way, including fuel and lodging.

request from the U.S. Attorney's Office in Chicago after the hearing before this Court on October 16, 2025, BPA 1 sent an email to his entire station directing that no one touch the CBP vehicle. The ranking station supervisor reinforced that message with another email on October 17, 2025, stating that no one was to use or touch the CBP vehicle. After October 16, 2025, no additional repair work was performed on the CBP vehicle.

CBP's garage at the Maine station is under video surveillance and preserved recordings show the CBP vehicle in the garage, including when BPA 1 pulled into the garage on October 10, 2025, and the mechanic worked on the car on October 14, 2025. On or about October 23, 2025, the CBP vehicle was picked up and transported by flatbed truck to Chicago, arriving at the FBI Chicago Office on October 25, 2025.

On October 30, 2025, defense counsel and their investigators examined the CBP vehicle at the FBI's Chicago Office.

## II.    DISCUSSION

Defendant requested a hearing prior to receiving any discovery from the government, for the purpose of "inform[ing defendant's] next request from this Court" based on the alleged destruction of evidence related to the CBP vehicle. Since the time the defense filed its motion, defendant has received substantial discovery detailing the transport and handling of the CBP vehicle after the collision and has had the opportunity to inspect the CBP vehicle.

The Due Process Clause imposes duties on the government not to deprive a defendant of exculpatory evidence. In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Court held that "the suppression by the prosecution of evidence favorable to an

accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Failure to preserve evidence violates due process if (1) the evidence was exculpatory, (2) its exculpatory value was apparent before its loss, and (3) the defendant remains unable to "obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489 (1984).

If, however, the exculpatory evidence was not apparently exculpatory, but rather, merely "potentially useful," the loss or lack of preservation of evidence by the government does not violate due process unless the defendant can show "bad faith on the part of the police." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Bad faith requires proof of an "'official animus' or a 'conscious effort to suppress exculpatory evidence,' and necessarily turns on an official's subjective knowledge that the evidence in question had exculpatory value at the time it was lost or destroyed." *United States v. Bell*, 819 F.3d 310, 318 (7th Cir. 2016) (*quoting Jones v. McCaughtry*, 965 F.2d 473, 477 (7th Cir. 1992). Here, the defendant fails to meet any of these requirements.

As to the issue of bad faith, based on the evidence the government has disclosed to the defendant, no aspect of the vehicle's handling and transport after the collision even remotely suggests the possibility of "official animus" or a "conscious effort to suppress exculpatory evidence" on the part of BPA 1 or any other government personnel. The FBI's Evidence Response Team processed the CBP vehicle, leading supervisory personnel from the FBI, CBP, and the U.S. Attorney's Office to

7

reasonably conclude that any evidentiary value of the vehicle had been fully preserved, and that it was not necessary to preserve the vehicle in the same condition for evidentiary purposes. BPA 1 drove the CBP vehicle back to Maine after it was released to him without restriction or any special instructions from his superiors.

With respect the remaining prongs of the analysis, the defendant has yet to provide any basis to conclude that the government's failure to preserve the CBP vehicle in precisely the same condition it was in after the collision resulted in the loss or destruction of any material evidence—much less any evidence that was exculpatory, or apparently exculpatory. Defendant has not shown—or even asserted—that the evidence preserved, including photographs, paint samples, the dents and scratches remaining on the CBP vehicle, and information captured by the vehicle's onboard computer, is insufficient for defense purposes, particularly in combination with other available evidence, such as both defendants' cars, the condition of which has not been changed since the collision. Thus, defendant has not established that (1) any of the alleged evidence was exculpatory, (2) that the exculpatory value of any alleged evidence was apparent before its loss, or (3) the defendant remains unable to "obtain comparable evidence by other reasonably available means" as required by *California v. Trombetta*, 467 U.S. 479, 489 (1984).

Accordingly, considering the extensive evidence preserved, collected and disclosed to defendant since the filing of the defense's motion, as well as the lack of any proof that any apparently exculpatory evidence has been lost or destroyed—or that comparable evidence is not otherwise available—the government respectfully

8

submits that no hearing regarding the transport and handling of the CBP vehicle is warranted.

## III.     CONCLUSION

WHEREFORE, the government respectfully requests that the Court convert the hearing now scheduled for November 5, 2025 to a status hearing for discussion of further proceedings on defendant's motion.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:     */s/ Ronald L DeWald*
RONALD DEWALD
AARON BOND
Assistant United States Attorneys