# EXHIBIT G

No. 25A

# In the Supreme Court of the United States

———————

Donald J. Trump, President of the United States, et al., applicants

*v.*

State of Illinois and City of Chicago

———————

**APPLICATION TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

———————

D. John Sauer
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## TABLE OF CONTENTS

Parties to the Proceeding ............................................................................ ii

Related Proceedings .................................................................................... ii

Statement ...................................................................................................... 6

Argument ..................................................................................................... 18

I.     The Federal Government Is Likely To Succeed On The Merits ................... 19

       A.     The Decision Whether To Call Up The National Guard Is Committed Exclusively To The President ................................................. 19

       B.     The President's Invocation of Section 12406 Was A Lawful Response To Violent Threats To Federal Personnel And Property ...................... 27

II.    The Other Factors Support Relief From The District Court's Order ............. 34

       A.     The Issues Raised By The Order Warrant Certiorari .......................... 34

       B.     The District Court's Order Causes Irreparable Harm To The Executive Branch And Threatens The Safety Of Federal Law Enforcement ...... 35

       C.     The Balance Of Equities Weighs Strongly In Favor Of The Federal Government ................................................................................ 38

III.   The Court Should Grant An Immediate Administrative Stay ...................... 40

Conclusion ................................................................................................... 40

ii

## PARTIES TO THE PROCEEDING

Applicants (defendants-appellants below) are Donald J. Trump, in his official capacity as President of the United States; Peter Hegseth, in his official capacity as Secretary of Defense (hereinafter Secretary of War); Kristi Noem, in her official capacity as Secretary of Homeland Security; Daniel P. Driscoll, in his official capacity as Secretary of the Army; the United States Department of Defense (hereinafter Department of War); the United States Department of Homeland Security; and the United States Army.

Respondents (plaintiffs-appellees below) are the State of Illinois and the City of Chicago.

## RELATED PROCEEDINGS

United States District Court (N.D. Ill.):

*Illinois* v. *Trump*, No. 25-cv-12174 (Oct. 9, 2025) (granting injunction)

United States Court of Appeals (7th Cir.):

*Illinois* v. *Trump*, No. 25-2798 (Oct. 11, 2025) (granting in part and denying in part motion for administrative stay)

*Illinois* v. *Trump*, No. 25-2798 (Oct. 16, 2025) (granting in part and denying in part motion for stay pending appeal)

# In the Supreme Court of the United States

————————

No. 25A

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL., APPLICANTS

*v.*

STATE OF ILLINOIS AND CITY OF CHICAGO

————————

**APPLICATION TO STAY THE ORDER ISSUED
BY THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
AND REQUEST FOR AN IMMEDIATE ADMINISTRATIVE STAY**

————————

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General—on behalf of Donald J. Trump, President of the United States, et al.—respectfully applies for a stay of the order of October 9, 2025, issued by the U.S. District Court for the Northern District of Illinois (App., *infra*, 1a-2a), pending the consideration and disposition of the government's appeal to the U.S. Court of Appeals for the Seventh Circuit and, if the court of appeals affirms the order, pending the timely filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court. In addition, the Solicitor General respectfully requests an immediate administrative stay to prevent ongoing and intolerable risks to the lives and safety of federal personnel while this Court considers this application.

This case presents what has become a disturbing and recurring pattern: Federal officers are attempting to enforce federal immigration law in an urban area containing significant numbers of illegal aliens. The federal agents' efforts are met with prolonged, coordinated, violent resistance that threatens their lives and safety and

(1)

systematically interferes with their ability to enforce federal law.

That resistance succeeds to an alarming degree in its aim of obstructing federal agents from enforcing federal immigration law. Federal agents are forced to desperately scramble to protect themselves and federal property, allocating resources away from their law-enforcement mission to conduct protective operations instead. Receiving tepid support from local forces, they are often left to fend for themselves in the face of violent, hostile mobs. Confronted with intolerable risks of harm to federal agents and coordinated, violent opposition to the enforcement of federal law, the President lawfully determines that he is unable to enforce the laws of the United States with the regular forces and calls up the National Guard to defend federal personnel, property, and functions in the face of ongoing violence.

Local political leaders immediately sue in federal district court to prevent the President from deploying federal forces to protect federal agents and enable them to enforce federal immigration law. The district court then issues an opinion granting injunctive relief against the President's action that downplays or denies the ongoing threat to the lives and safety of federal agents, substitutes the court's own judgment for the President's about the need for military augmentation, and gives little or no weight to the United States' interest in enforcing federal immigration law. The district court then countermands the exercise of the President's Commander-in-Chief authority and projects its own authority into the military chain of command.

This pattern began in Los Angeles in early June, when violent mobs targeted federal personnel and federal buildings to thwart increased enforcement efforts by Immigration and Customs Enforcement (ICE). After local and state authorities failed to stem the violence, the President called up members of the California National Guard. A district court in San Francisco twice sought to enjoin the Los Angeles de-

ployment.  The Ninth Circuit stayed both injunctions—emphasizing, with respect to the first one, that federal courts owe an exceptionally high degree of deference (at the very least) to the President's judgment in determining whether the facts on the ground warrant calling up the National Guard.  See *Newsom* v. *Trump*, 141 F.4th 1032, 1040 (9th Cir. 2025) (per curiam) (stay pending appeal); see also Order, *Newsom* v. *Trump*, No. 25-5553 (9th Cir. Sept. 4, 2025) (administrative stay).  Lower-court proceedings are ongoing regarding a similar injunction stopping the President from federalizing the Oregon National Guard to address violent opposition to federal immigration officers in Portland.

This application concerns yet another injunction, forbidding the President from deploying federalized National Guard members in Illinois in response to months of similar violence targeting federal immigration officers in the Chicago area.  In recent weeks, federal officers in Chicago have been threatened and assaulted, attacked in a harrowing pre-planned ambush involving many assailants, rammed in their government vehicles, shot at with fireworks and other improvised weapons, injured and hospitalized, and threatened in person and online—including by a $10,000 bounty for the murder of a senior federal official.  Violent agitators have repeatedly obstructed access to a critical federal immigration facility in the Chicago suburb of Broadview.  The Department of Homeland Security (DHS) and other federal law enforcement agencies have been forced to operate under the constant threat of mob violence and to divert resources from enforcement efforts to protect federal agents and property.  Local forces have failed to respond, or unaccountably delayed their response, even when federal agents face life-threatening violence.  DHS has also been forced to reallocate resources from enforcing the Nation's immigration laws in other regions to protect personnel at federal facilities and on the streets of Chicago.

4

On October 4, 2025, the President determined that the situation in Chicago had become unsustainably dangerous for federal agents, who now risk their lives to carry out basic law enforcement functions. The President therefore exercised the authority vested in him by 10 U.S.C. 12406 to call into active federal service 300 members of the Illinois National Guard. The President deployed the federalized Guardsmen to Illinois to protect federal officers and federal property. They will be joined by an additional 400 federalized members of the Texas National Guard. All of those soldiers will serve under federal command and will be deployed solely in a protective capacity—not to engage in civilian law enforcement functions.

Section 12406 authorizes the President to call into active federal service members of any State's National Guard whenever, as relevant here, "the President is unable with the regular forces to execute the laws of the United States," or "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. 12406(2) and (3). Both conditions are satisfied here. The President had ample evidence before him that, due to violence and the constant threat of violence, the regular federal law enforcement forces in Chicago have been "unable * * * to execute" fully federal immigration laws and laws against assaulting and obstructing federal officers. The violence targeted at federal personnel and property in Illinois in recent weeks also constitutes a "rebellion or danger of rebellion" under the ordinary meaning of those terms, which encompass violent opposition to federal authorities' enforcement of particular federal laws.

The district court concluded that the preconditions in Section 12406(2) and (3) were not satisfied here and enjoined the National Guard deployment for demonstrably flawed reasons that will not survive this Court's scrutiny. As a threshold matter, this Court long ago held that "the authority to decide whether [an] exigency has

arisen[]" justifying the federalization of the militia "belongs exclusively to the President," whose judgment is "conclusive." *Martin* v. *Mott*, 25 U.S. (12 Wheat.) 19, 30 (1827). The lower courts sought to limit *Martin* to its facts, but that seminal decision squarely controls here. And even if the President's judgment were amenable to judicial review, any such review must be highly deferential, as the Ninth Circuit has concluded in the *Newsom* litigation.

The district court's injunction impermissibly substitutes the court's own judgment for the President's on military matters and rests on a construction of Section 12406 that would render the statute a virtual nullity. With respect to Section 12406(3), the court concluded that the President is not "unable" to execute federal law so long as *any* quantum of federal enforcement can still occur. See App., *infra*, 23a-24a. But the President need not await a "total failure of the civil power" (*id.* at 73a) before calling in the National Guard to help keep the peace and ensure that federal law enforcement officers may perform their duties safely. The court similarly limited the term "rebellion" in Section 12406(2) to organized efforts to overthrow the federal government as a whole—such as the formation of the Confederacy and the firing on Fort Sumter—and dismissed the violence in Chicago as not "akin to another Civil War." *Id.* at 66a. The court acknowledged that violence against federal officers and property has occurred, but sought, indefensibly, to minimize it—refusing to credit sworn declarations from federal officials and instead accepting the implausibly rosy assessment of state and local officials. See App., *infra*, 42a-44a.

The Seventh Circuit granted in part and denied in part the government's emergency request for a stay pending appeal. App., *infra*, 86a-103a (per curiam); see also *id.* at 85a (partial administrative stay). The court of appeals stayed that portion of the district court's October 9 injunction forbidding the federalization of members of

the National Guard but left in place the portion of the injunction forbidding the *deployment* of the federalized troops to Illinois to perform the protective mission ordered by the President. *Id.* at 102a-103a. That result eviscerates the President's order. It deprives DHS officers of the protections that the President sought to give them from ongoing violence, prevents the Guard from ensuring the enforcement of federal law, and puts lives and property in danger. It also places the Seventh Circuit in the untenable position of controlling the military chain of command and judicially micromanaging the exercise of the President's Commander-in-Chief powers, including the decision about which military forces the President can deploy.

This Court should stay the district court's October 9 injunction in its entirety. The injunction improperly impinges on the President's authority and needlessly endangers federal personnel and property. The balance of harms weighs strongly in favor of interim relief pending appeal and (if necessary) certiorari, so that the National Guard may perform its protective function while any further litigation is ongoing. Given the pressing risk of violence, this Court should also grant an immediate administrative stay pending consideration of the present application.

## STATEMENT

1. Since the summer, mass violent resistance to the enforcement of federal law, directed at federal personnel and federal property, has erupted in several cities throughout the country. See D. Ct. Doc. 62-2, at 21-60 (Oct. 8, 2025) (Hott Decl. ¶¶ 48-60). Although the violence and riots have varied in intensity and duration, they have commonly sought to frustrate federal enforcement of the Nation's immigration laws. In early June, for example, violent mobs in Los Angeles, California, surrounded and damaged facilities used by DHS for immigration enforcement and attacked federal officers with rocks, commercial-grade fireworks, concrete chunks,

and other makeshift weapons, trapping one federal officer in her vehicle and shattering the wrist of another. See *id.* ¶¶ 49-51; *Newsom* v. *Trump*, 141 F.4th 1032, 1041 (9th Cir. 2025) (per curiam).

In response to the violence in Los Angeles, the President called into active federal service members of the California National Guard, who were then deployed to the area to protect federal property, personnel, and functions. See *Newsom*, 141 F.4th at 1042-1043; see also D. Ct. Doc. 62-1, at 19-20 (Oct. 8, 2025) (June 7 Memorandum). Each State has a National Guard that functions as an organized component of the militia contemplated by the Constitution, Art. I, § 8, Cls. 15-16. See 10 U.S.C. 246(b)(1); 32 U.S.C. 101(4) and (6). Individuals who enlist in a State's National Guard also simultaneously enlist in the "National Guard of the United States," which is a reserve component of the federal armed forces, under the ultimate authority of the President as Commander in Chief. See 10 U.S.C. 10105, 10111; *Perpich* v. *Department of Def.*, 496 U.S. 334, 339-346 (1990). Members of a State's National Guard may be "federalized" under conditions and for purposes specified by federal law. *Gilligan* v. *Morgan*, 413 U.S. 1, 7 (1973).

Notwithstanding the Governor of California's claim that deployment of the National Guard to Los Angeles would "escalat[e]" the ongoing violence that California itself had failed to prevent, *Newsom* v. *Trump*, 786 F. Supp. 3d 1235, 1245 (N.D. Cal. 2025) (citation omitted), appeal pending, No. 25-3727 (9th Cir.), the President's action had the opposite, intended effect. In the face of federal military force, violence in Los Angeles decreased and the situation substantially improved. In the interim, however, the situation in Chicago deteriorated. Since June, Chicago has been the site of organized and often violent protests directed at ICE officers and other federal personnel engaged in the execution of federal immigration laws. Hott Decl. ¶¶ 12-29. Without

8

the force protection provided by the National Guard, the violence in Chicago persisted beyond the summer and recently intensified.

Much of the violence has focused on a DHS facility in Broadview, west of downtown Chicago. Hott Decl. ¶ 30-31; D. Ct. Doc. 62-4, at 4-5 (Oct. 8, 2025) (Parra Decl. ¶¶ 10-15). The Broadview facility is the only intake and processing center in the area for ICE operations; accordingly, access to the facility is crucial to federal immigration enforcement. Hott Decl. ¶ 30. Since early September, protestors have blocked government vehicles from entering or exiting the facility, slashed the tires of government vehicles, and obstructed nearby roads. Parra Decl. ¶¶ 11-14. The federal employees who work there have faced violence and threats of violence, and their personal cars have been vandalized. Hott Decl. ¶ 31. In a common tactic, "one rioter would jump on the hood of a car" coming into or out of the facility "and another would stand immediately behind the car. While the driver stopped the car in the face of these obstacles, others would run up to the car and slash the tires." *Ibid.*

On multiple occasions, federal officers have also been hit and punched by protestors at the Broadview facility. Hott Decl. ¶ 35. The physical altercations "became more significant and the clashes more violent" as the size of the crowds swelled throughout September. *Ibid.* Rioters have targeted federal officers with fireworks and have thrown bottles, rocks, and tear gas at them. *Id.* ¶¶ 36-37. On September 26 and 27, DHS was forced to deploy dozens of officers to disperse rioters seeking to obstruct access to the facility. Parra Decl. ¶¶ 14-15. Rioters have also vandalized the building, torn down pipes and downspouts on its exterior, and threatened the employees of nearby businesses. See Hott Decl. ¶¶ 32-33. "More than thirty [DHS] officers have been injured during the assaults on federal law enforcement" at the Broadview facility alone, resulting in multiple hospitalizations. *Id.* ¶ 43.

DHS personnel and their families have also been the subject of targeted threats of violence and acts of vandalism. Hott Decl. ¶ 44. On October 3, 2025, a high-ranking member of a Chicago criminal gang placed a $10,000 bounty for the murder of the Commander at Large of the U.S. Border Patrol, who had recently participated in immigration enforcement operations in Chicago, or $2,000 for his kidnapping. Parra Decl. ¶ 17; see Hott Decl. ¶ 24. That gang leader was arrested on October 6 in Chicago and has been charged with soliciting murder. See Press Release, U.S. Att'y N.D. Ill., U.S. Dep't of Justice, *Alleged Member of Chicago Street Gang Charged with Soliciting the Murder of Senior Law Enforcement Official Involved in "Operation Midway Blitz"* (Oct. 6, 2025), https://www.justice.gov/usao-ndil/pr/alleged-member-chicago-street-gang-charged-soliciting-murder-senior-law-enforcement.

DHS officers have also been threatened and assaulted while performing their federal duties in the Chicago area—including at least one carefully orchestrated ambush. On October 4, 2025, the day of the President's order, a Customs and Border Protection (CBP) vehicle carrying federal law enforcement officers was "intentionally boxed in on a public road" in Chicago "by approximately 10 civilian vehicles." Hott Decl. ¶ 20. Two cars then rammed directly into the government vehicle. *Ibid.* When the federal officers exited their vehicle, one of the cars that had rammed into them drove directly at a Border Patrol agent, who drew her service weapon and fired at the driver, who was hit but fled the scene (only to be arrested later, in possession of a gun). *Ibid.* Approximately 200 rioters gathered in the area after the shooting, throwing glass bottles and other objects at the besieged federal agents. *Ibid.* The Chicago police initially refused to assist the agents and eventually responded more than an hour after the shooting. *Ibid.* When the Chicago police refused to respond immediately, DHS attempted to send its own Quick Response Force to the area, but the ve-

hicle carrying the response team was itself rammed en route. *Id.* ¶ 21. Later that day, ICE officers in a government van were surrounded elsewhere in the city by protestors, who slashed the van's tires. *Id.* ¶ 22. The ICE officers called for assistance, but no federal law enforcement officers were immediately available to respond because they were already attempting to deal with the day's earlier incidents. *Ibid.* The ICE officers were forced to abandon their vehicle and flee for their safety. *Ibid.*

As that episode reflects, DHS personnel in Chicago are straining to respond to the ongoing violence. See Hott Decl. ¶¶ 45-47. The agency has been forced to divert resources away from its core mission of enforcing immigration law toward instead protecting its personnel and property—necessarily thwarting, in significant part, the enforcement of federal immigration law. At Broadview, for example, the agency has used four-officer security details merely to escort employees into the office when they arrive for work. *Id.* ¶ 31. DHS has transferred five special response teams (SRTs) from other cities into Chicago and has put SRT officers on 12-hour shifts protecting the facility. *Id.* ¶¶ 34, 45. Moving resources into Chicago and shifting some functions that would otherwise be performed in Chicago to other areas of the country creates a "domino effect" that impedes the agency's efforts nationwide. *Id.* ¶ 47.[1]

State and local officials have not ameliorated the situation. To the contrary, the initial refusal of the Chicago police to respond to the October 4 shooting is em-

---

[1] The events in Chicago are not occurring in a vacuum. On September 24, 2025, an ICE facility in Dallas, Texas, was the site of a "premediated terrorist act targeting ICE agents." Hott Decl. ¶ 59. A shooter killed two detainees in an apparent effort to murder federal agents; investigators found anti-ICE notes and marked ammunition after the attack. *Ibid.* And just this past week, DHS reported that "Mexican criminals, in coordination with domestic extremist groups[,] have placed targeted bounties" on DHS personnel in Chicago, with tiered bounties up to $50,000 for kidnapping, assaulting, and assassinating federal law enforcement officers and senior officials. DHS, *Bounties Originating from Mexico Offered to Shoot ICE and CBP Officers in Chicago* (Oct. 14, 2025), https://www.dhs.gov/news/2025/10/14/bounties-originating-mexico-offered-shoot-ice-and-cbp-officers-chicago.

blematic of a troubling pattern. Chicago's political leaders have expressed great hostility to federal officers and their attempts to enforce federal immigration laws, and local forces provide a tepid response, at best, when federal officers are attacked and obstructed. See Hott Decl. ¶¶ 9-11. During the recent spate of violent protests, "[s]tate and local public officials have disparaged members of CBP and ICE in press conferences," including the Mayor's inflammatory description (on October 6) of federal agents as a "'rogue, reckless group of heavily armed and masked individuals roaming throughout our city.'" Parra Decl. ¶ 23. The Governor of Illinois has made similar public statements, including describing federal agents as "acting like jack-booted thugs." *Ibid.* And the Mayor has purported to declare all city-owned property an "ICE-Free Zone." Parra Decl. ¶ 23 n.3.

2.     In light of the recent violence and the strain on its resources in attempting to quell that violence, DHS formally requested the assistance of the Department of War (DoW) to protect federal personnel and property in the Chicago area, including at the Broadview facility. See D. Ct. Doc. 62-1, at 12-14 (Oct. 8, 2025) (Nordhaus Decl. ¶¶ 12, 14). The first request, dated September 26, explained that federal facilities in Illinois had "come under coordinated assault by violent groups intent on obstructing lawful federal enforcement actions." *Id.* at 13. The second request, dated October 3, reiterated DHS's urgent need for "immediate and sustained assistance from [DoW] to safeguard federal personnel, facilities, and operations" in Illinois. *Id.* at 10. DHS requested the deployment of "300 DoW personnel, trained and equipped for mission security in complex urban environments." *Id.* at 11.

On October 4, 2025, the President determined that "[t]he situation in the State of Illinois, particularly in and around the city of Chicago, cannot continue." Presidential Memorandum for the Secretary of War et al., *Department of War Security for*

12

*the Protection of Federal Personnel and Property in Illinois* 1 (Oct. 4, 2025) (Presidential Memorandum) (reprinted at D. Ct. Doc. 62-1, at 16-17). The President observed that "[f]ederal facilities in Illinois, including those directly supporting [ICE] and the Federal Protective Services (FPS), have come under coordinated assault by violent groups intent on obstructing Federal law enforcement activities." *Ibid.* The President further observed that the "violent activities" in the Chicago area "appear to be increasing," and that such activities were "not occurring in isolation" but rather were part of a pattern of "ongoing efforts in multiple States and cities around the country to disrupt the faithful enforcement of Federal law." *Ibid.*

The President therefore invoked his express authority under 10 U.S.C. 12406—the same statute that he had invoked in June to call up members of the California National Guard in response to the Los Angeles riots, see *Newson*, 141 F.4th at 1041—to call into active federal service up to 300 members of the Illinois National Guard. Presidential Memorandum 1-2. Section 12406 provides that "the President may call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary" to address any of three circumstances. 10 U.S.C. 12406. Those circumstances are: (1) an invasion or "danger of invasion by a foreign nation"; (2) "a rebellion or danger of a rebellion against the authority of the Government of the United States"; or (3) "the President is unable with the regular forces to execute the laws of the United States." *Ibid.* When the President determines that any of those threats is present, he may "call into Federal service members and units of the National Guard of any State in such numbers as he considers necessary to repel the invasion, suppress the rebellion, or execute those laws." *Ibid.*

In invoking Section 12406, the President determined that the recent acts of violent obstruction in Illinois, "as well as the credible threat of continued violence,

impede the execution of the laws of the United States." Presidential Memorandum 1. The President further determined that "the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." *Ibid.* He did not, however, order members of the National Guard themselves to execute federal immigration laws. Instead, the President ordered the Guardsmen to perform the same kind of protective mission that he had ordered in Los Angeles. *Id.* at 2. The President also made the federal call-up order contingent on first affording the Governor of Illinois an opportunity to consent to the activation of 300 members of the Illinois National Guard in a so-called "Title 32" status, in which the activities of the Guard would have been federally funded but they would have remained under the command of state authorities. *Ibid.* The Governor declined. Nordhaus Decl. ¶ 20.

On October 5, the Secretary of War implemented the President's directive by mobilizing 300 members of the Illinois National Guard into active federal service. Nordhaus Decl. ¶¶ 21-22. By separate orders, the Secretary also called into active federal duty 400 members of the Texas National Guard to assist in protecting federal personnel and property, including in Chicago. *Id.* ¶ 23; see D. Ct. Doc. 62-1, at 26. All 700 Guardsmen are under the command and control of the U.S. Northern Command. Nordhaus Decl. ¶¶ 22-23. After appropriate training, the federalized Guardsmen "will perform duties in accordance with the federal protection mission as authorized by the President." D. Ct. Doc. 62-3, at 3 (Oct. 8, 2025) (Knell Decl. ¶ 8). Consistent with the President's memorandum and implementing DoW orders and policies, the Guardsmen will be available to respond "to requests for assistance from Federal Government agents and agencies only when they are related to protection of federal personnel performing official functions, as well as requests for protection duties

14

such as protection of federal buildings." *Ibid.* "The federalized National Guard will not be engaged in law enforcement activities." *Ibid.*

3. On October 6, 2025, the State of Illinois and the City of Chicago filed the suit at issue here, naming as defendants the President, the Secretary of War, and other federal officials and agencies involved in the mobilization and deployment of the National Guard. Compl. ¶¶ 13-21. The plaintiffs principally assert that the President's federalization of the National Guard in response to violence in Chicago was *ultra vires* and failed to satisfy the criteria specified in Section 12406. Compl. ¶¶ 211-218. The plaintiffs also assert that using federal Armed Forces, including the National Guard, for "protest management or the suppression of violent crime or property damage" violates the Posse Comitatus Act. Compl. ¶ 222. The Posse Comitatus Act makes it a crime to "willfully use[] any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space Force * * * to execute the laws," except as expressly "authorized by the Constitution or Act of Congress." 18 U.S.C. 1385. The complaint also contains additional claims, asserting violations of the Tenth Amendment, state sovereignty, the separation of powers, the Militia Clauses, the Take Care Clause, and the Administrative Procedure Act (APA), 5 U.S.C. 701 *et seq.*. Compl. ¶¶ 225-276.

The plaintiffs moved for a temporary restraining order on the same day that they filed their complaint. D. Ct. Doc. 13 (Oct. 6, 2025). At a status hearing later that day, the district court set an expedited briefing schedule and scheduled a hearing for October 9 on the plaintiffs' request for injunctive relief. At the conclusion of the October 9 hearing, the court issued an oral ruling, to be followed by a written opinion, and entered an injunction. See App., *infra*, 1a-2a (order), 5a-27a (oral opinion). The court's October 9 order enjoins the federal defendants (with the exception of the President) from "ordering the federalization and deployment of the National Guard * * *

within Illinois." *Id.* at 1a. Although the court's order is styled as a "Temporary Restraining Order" and by its terms is scheduled to last only until October 23, the court also set a telephone hearing for October 22 to address whether to extend the order for an additional 14 days. *Id.* at 2a.

In its oral opinion, the district court made clear that it was granting the plaintiffs' request for injunctive relief based solely on the plaintiffs' theory that the statutory preconditions for the President to call up the National Guard under Section 12406 were not satisfied by the facts on the ground in Illinois. See App., *infra*, 20a. The court "d[id] not doubt that there have been acts of vandalism, civil disobedience, and even some assaults on federal agents." *Id.* at 13a-14a. But the court stated that it would credit the assessment of the plaintiffs' declarants, who claimed that "state and local law enforcement officers are able to maintain safety and control outside of [the Broadview] processing center." *Id.* at 13a. Notably, even on the plaintiffs' alternative account, the protests at Broadview have recently involved groups as large as "100 to 150 protestors," *id.* at 9a (September 26); see *id.* at 10a ("very large crowd" of up to "200 protestors" on October 3), and have repeatedly required the intervention of numerous federal, state, and local law enforcement agencies, *id.* at 9a-10a.

The district court did not meaningfully address any of the incidents of violence directed at federal personnel outside of the Broadview facility. The court acknowledged that declarations submitted by federal officials "report significantly more unrest, not just in Broadview, but in the Chicagoland area as a whole." App., *infra*, 13a. But the court chose not to credit those declarations in light of what it called "independent and objective evidence that DHS's perceptions of events are simply unreliable." *Id.* at 14a. That "evidence" consisted of what the court conceded to be "things outside of the record in this particular case," including recent decisions by two federal

grand juries not to return indictments in cases involving alleged assaults on federal officers. *Ibid.* The court also conducted its own *ex parte* investigation of one claim by a federal declarant, regarding a request for security at the federal courthouse, and found that the declarant's good-faith mistake, which was corrected during the October 9 hearing, rendered her entire testimony "unreliable." *Id.* at 44a.[2]

Having minimized or disregarded outright the evidence of violence proffered by federal officials, the district court proceeded to hold that the President's decision to invoke Section 12406 was amenable to judicial review, see App., *infra*, 17a-20a, and that the plaintiffs are likely to succeed in showing that neither Section 12406(2) nor Section 12406(3) warranted the President's action. With respect to Section 12406(3), the court stated that the President is "unable" to execute federal law within the meaning of that provision only if the President is literally "incapable" of executing the law with the regular forces. *Id.* at 23a; see *ibid.* ("You are either able to do something or you're unable to do it."). The court reasoned that, because ICE is "[s]tastically speaking" engaging in more numerous enforcement operations "than it was a year ago," it must necessarily follow that the President is not "unable, with the regular forces, to execute the laws of the United States." *Id.* at 23a-24a. With respect to Section 12406(2), the court stated that the term "rebellion" means "a deliberate, organized, resistance openly and avowedly opposing the laws and authority of the government as a whole by means of armed opposition and violence," *id.* at 22a, and the court viewed the recent "attacks on federal agents" and "federal property damage" in Illinois as failing to satisfy that definition, *id.* at 23a.

---

[2] Major General Knell had initially averred that U.S. Northern Command had received a request for federalized National Guard troops to protect the "Federal District Court" on October 10. Knell Decl. ¶ 9. Major General Knell later clarified that the request had involved "the Federal Plaza and the Federal buildings in the immediate area," not the courthouse itself. D. Ct. Doc. 65-1, at 2 (Oct. 9, 2025).

17

The district court also agreed with the plaintiffs' contention that the plaintiffs would suffer irreparable harm in the absence of an injunction, based on the plaintiffs' speculative prediction that "deployment of the National Guard is likely to lead to civil unrest, requiring the deployment of state and local resources to maintain order." App., *infra*, 24a. Echoing the plaintiffs, the court referred to ICE's enforcement of federal immigration law in Chicago as "provocative" and as "caus[ing] a significant increase in protest activity." *Ibid.* The court concluded that federalizing the National Guard and deploying Guardsmen to protect federal personnel and property "will only add fuel to the fire that the defendants themselves have started." *Id.* at 25a.

The district court declined to grant a stay of the October 9 injunction. App., *infra*, 2a. The federal government immediately filed a notice of appeal. The next day, on October 10, the court issued a 51-page written opinion regarding its injunction. App., *infra*, 34a-84a. The court's written opinion largely tracked its earlier oral opinion, including the court's decision to rest the injunction on Section 12406, not the Posse Comitatus Act. See *id.* at 52a-53a, 81a. The court also found that the plaintiffs are likely to succeed on their Tenth Amendment claim—but only because, in the court's view, Section 12406 does not authorize the federalization. See *id.* at 81a.

4. On October 11, 2025, the court of appeals granted in part and denied in part the federal government's emergency request for an administrative stay. App., *infra*, 85a. The court of appeals stayed that portion of the district court's October 9 injunction that had enjoined the federalization of the National Guard in Illinois. *Ibid.* But the court of appeals declined to stay the portion of the injunction forbidding the *deployment* of federalized National Guard troops within Illinois. *Ibid.* As a result, the Guardsmen remain under federal command but cannot perform the protective mission the President ordered.

On October 16, 2025, the court of appeals granted in part and denied in part the federal government's motion for a stay pending appeal on the same terms—*i.e.*, allowing the federalization to proceed during litigation but not the deployment. App., *infra*, 86a-103a. The court of appeals agreed with the government that the district court's October 9 order is an appealable injunction. *Id.* at 93a-94a. On the merits, however, the court of appeals took the view that the government is not likely to succeed on appeal in showing that the President's federalization order was lawful under Section 12406(2) and (3). The government had argued that such decisions are committed to the discretion of the President and are unreviewable in light of this Court's decision in *Martin* v. *Mott*, 25 U.S. (12 Wheat.) 19 (1827). The court rejected that argument, reading *Martin* to be limited to a militiaman opposing his call-up orders in the historical context of the War of 1812. App., *infra*, 95a-96a. On the merits, the court largely adopted the same narrow interpretation of Section 12406 as the district court and treated much of the parties' dispute as implicating factual findings reviewable only for clear error. See *id.* at 98a-101a. As for the equities, the court of appeals acknowledged that "the federal government has a strong interest in the protection of its agents and property," but it nonetheless declined to permit the President to deploy the federalized National Guard to safeguard federal personnel and property during the ongoing litigation. *Id.* at 101a.

## ARGUMENT

Under Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, to obtain a stay of an interlocutory order pending review in the court of appeals and in this Court, an applicant must show a likelihood of success on the merits, a reasonable probability of obtaining certiorari, and a likelihood of irreparable harm. See *Hollingsworth* v. *Perry*, 558 U.S. 183, 190 (2010) (per curiam). In "close cases," the

Court will balance the equities and weigh the relative harms. *Ibid.* Those factors overwhelmingly support a stay here.[3]

## I. THE FEDERAL GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

The federal government is likely to succeed in vacating the district court's order. The President's invocation of 10 U.S.C. 12406 was lawful and consistent with a long historical tradition, tracing back to President Washington's response to the Whiskey Rebellion, of relying on the Armed Forces and the militia to assist in responding to violent resistance to federal law enforcement. Most fundamentally, the decision whether to call up the National Guard in order to protect federal personnel and federal property is for the President to make—not the State of Illinois or a federal district court. And regardless, the district court's cramped construction of Section 12406 and its disregard for the sworn declarations of federal officials are indefensible.

### A. The Decision Whether To Call Up The National Guard Is Committed Exclusively To The President

1. As a threshold matter, both the statutory language and historical tradition make clear that the President's decision whether to federalize the Guard is not subject to second-guessing by the State of Illinois or a federal district court.

Section 12406 provides that whenever any of three circumstances is satisfied, "the President may call into Federal service members and units of the National Guard

---

[3] As in *Department of Education* v. *California*, 604 U.S. 650 (2025) (per curiam), "several factors counsel in favor of construing the District Court's order as an appealable preliminary injunction." *Id.* at 651. Among others, the order "carries * * * the hallmark[] of a preliminary injunction" in that it was supported by lengthy oral and written opinions issued after full briefing and an adversary hearing; the court's "'basis for issuing the order is strongly challenged'" on the grounds set forth below; and the order threatens to inflict irreparable harm by exposing ICE agents and other federal personnel to intolerable risks of violence in Illinois and usurping the President's statutory and constitutional powers. *Ibid.* (quoting *Sampson* v. *Murray*, 415 U.S. 61, 87 (1974)) (brackets omitted); see *Abbott* v. *Perez*, 585 U.S. 579, 594-595 (2018). The order's "TRO" label thus presents no impediment to interlocutory review, as the court of appeals correctly held. App., *infra*, 93a-94a.

of any State in such numbers as he considers necessary" to address those circumstances. 10 U.S.C. 12406. The President may invoke that authority when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States," or when "the President is unable with the regular forces to execute the laws of the United States." 10 U.S.C. 12406(2) and (3). The statute specifies that "[o]rders for these purposes shall be issued through the governors of the States." 10 U.S.C. 12406. But as the term "[o]rders" makes clear, *ibid.*, the President's determination to call up the National Guard is not a request to the States; it is a command. The President has express statutory authority to "call into Federal service" the National Guard, *ibid.*, after which the Guardsmen serve under the command and control of federal military officials and ultimately the President as Commander in Chief.

Section 12406 is one of a number of provisions in current law that implement the Militia Clauses in the Constitution. See *Perpich* v. *Department of Def.*, 496 U.S. 334, 339-346 (1990) (tracing the history of the National Guard). The Constitution vests Congress with the power to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," U.S. Const. Art. I, § 8, Cl. 15, as well as to "provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States," § 8, Cl. 16. Accordingly, when the President calls up the National Guard for federal service pursuant to an "express * * * authorization of Congress, his authority is at is maximum, for it includes all that he possesses in his own right plus all that Congress can delegate," and thus it is "supported by the strongest of presumptions and the widest latitude of judicial interpretation." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 635-637 (1952) (Jackson, J., concurring).

This Court long ago established that the President's exercise of the authority

vested in him by Congress to call up the militia is committed to his exclusive discretion by law. In *Martin* v. *Mott*, 25 U.S. (12 Wheat.) 19 (1827), a member of the militia of New York challenged the penalties imposed on him by a court martial after he refused to comply with orders to report for federal service as part of the War of 1812. See *id.* at 20-23 (statement of the case). President Madison had called the state militia into federal service pursuant to a 1795 law providing "that whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe, it shall be lawful for the President of the United States to call forth such number of the militia of the State or States most convenient to the place of danger, or scene of action, as he may judge necessary to repel such invasion." *Id.* at 29 (opinion of the Court). This Court refused to entertain the contention that the President had misjudged the danger of such an invasion, explaining that "the authority to decide whether the exigency has arisen[] belongs exclusively to the President," whose decision "is conclusive upon all other persons." *Id.* at 30.

That conclusion, the Court explained, "necessarily results from the nature of the power itself." *Martin*, 25 U.S. at 30. To be effective, the President's authority to call up the militia must receive "unhesitating obedience" from his military subordinates, consistent with "command of a military nature." *Ibid.* The Court also emphasized that the 1795 law "confided" the power to call up the militia "to the Executive of the Union" as Commander in Chief and thus "necessarily constituted" the President himself as "the judge of the existence of the exigency in the first instance." *Id.* at 31; accord *Luther* v. *Borden*, 48 U.S. (7 How.) 1, 43 (1849) (asking rhetorically whether, "[a]fter the President has acted and called out the militia, is a Circuit Court of the United States authorized to inquire whether his decision was right," and observing that extending the judicial power so far would be "a guarantee of anarchy");

see also, *e.g.*, *Morgan* v. *Rhodes*, 456 F.2d 608, 610 (6th Cir. 1972) (observing that, although plaintiffs have sought to challenge "[e]xecutive decisions to call out military forces  * * *  a number of times in the history of the Republic," in "no instance" have "the courts  * * *  sought to substitute judicial judgment for the constitutionally empowered judgment of the executive"), rev'd on other grounds, 413 U.S. at 6-12.

Those same principles apply here.  At bottom, the plaintiffs seek to use this suit to second-guess the President's judgment that recent and repeated acts of violence targeting federal facilities and personnel in Illinois warrant calling up the National Guard—including because the violence has left the President sufficiently "unable" to ensure faithful "execut[ion]" of federal law.  10 U.S.C. 12406(3).  Like the 1795 law at issue in *Martin*, Section 12406 makes clear that Congress has granted "the authority to decide whether" the statutory prerequisites are satisfied "exclusively to the President."  *Martin*, 25 U.S. at 30.

The district court understood *Martin* to have turned on the identity of the plaintiff—a militiaman challenging the federalization—and on the fact that the case involved a "foreign invasion" rather than a "purely domestic" controversy.  App., *infra*, 61a-62a.  The court of appeals agreed, stressing the historical context of the British invasion.  *Id.* at 95a-96a.  But nothing about the rationale of this Court's decision turned on or was limited to those particular facts.  The Court's reference to the "nature of the power" at issue, *id.* at 62a, meant the President's authority to call the militia into federal service under his command—an authority that would be substantially undermined if "subordinate officers or soldiers are pausing to consider whether they ought to obey, or are scrupulously weighing the evidence of the fact upon which the commander in chief exercises the right to demand their services."  *Martin*, 25 U.S. at 30.  Those concerns apply equally where, as here, the President calls up the Na-

23

tional Guard to address violent unrest in a State, and elected state officials ask a court to reweigh "the evidence of the facts upon which the commander in chief exercise[d]" his authority. *Ibid.* And to the extent the district court believed that modern developments in the "political question doctrine" had drained the force of *Martin*, the court was mistaken. App., *infra*, 59a; see *Baker* v. *Carr*, 369 U.S. 186, 213 (1962) (citing *Martin* for the proposition that "calling up of [the] militia" is nonjusticiable).

*Martin* and the many similar cases following it reflect the President's singular role in our constitutional system. The President was acting here as Commander in Chief, calling the National Guard into active federal service pursuant to express authority vested in him by Congress under the Militia Clauses. See U.S. Const. Art. I, § 8, Cl. 15; Art. II, § 2, Cl. 2. The effect of his decision was to transfer the operational command of 700 Guardsmen from state officials to the Commander of U.S. Northern Command. Nordhaus Decl. ¶¶ 17-23. The President was responding to repeated acts of violence that threatened the safety of federal personnel and property—concerns that implicate the President's inherent Article II authority "to use troops for the protection of federal property and federal functions." *Authority to Use Troops to Prevent Interference With Federal Employees by Mayday Demonstrations and Consequent Impairment of Government Functions*, 1 Supp. Op. O.L.C. 343, 343 (1971); see *id.* at 344 (discussing *In re Neagle*, 135 U.S. 1 (1890), and *In re Debs*, 158 U.S. 564 (1895)).

A federal district court lacks not only the authority but also the competence to wrest control of the military chain of command from the Commander in Chief and to adjudicate whether the Governor of Illinois, rather than the President, should be in ultimate command of particular Guardsmen after the President has called them into federal service under Section 12406. Cf. *Austin* v. *U.S. Navy SEALs 1-26*, 142 S. Ct. 1301, 1302 (2022) (Kavanaugh, J., concurring) (citing the "bedrock constitutional

24

principle" that "the President of the United States, not any federal judge, is the Commander in Chief of the Armed Forces," and explaining that "'courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs'") (quoting *Department of the Navy* v. *Egan*, 484 U.S. 518, 530 (1988)).

Even outside the military context, this Court has repeatedly emphasized that "[h]ow the President chooses to exercise the discretion Congress has granted him is not a matter for [judicial] review." *Dalton* v. *Specter*, 511 U.S. 462, 476 (1994). Put differently, when a valid statute "commits [a] decision to the discretion of the President," the President's exercise of discretion is not subject to judicial second-guessing. *Id.* at 474. That principle applies here notwithstanding that Section 12406 does not expressly state that it is the President who determines whether the specified criteria are met. Contra App., *infra*, 56a, 96a. The statute vests "the President," not the State of Illinois or a federal court, with the sole authority to decide whether the specified criteria are satisfied. 10 U.S.C. 12406.

2. The Ninth Circuit recently concluded that federal courts may "review the President's determination" that the statutory preconditions for federalizing the National Guard under Section 12406 are satisfied, but that any such review must be "highly deferential." *Newsom* v. *Trump*, 141 F.4th 1032, 1051-1052 (9th Cir. 2025) (per curiam). In the Ninth Circuit's view, a court may "at least review" whether the President's judgment "reflects a colorable assessment of the facts and law within a 'range of honest judgment.'" *Id.* at 1051 (quoting *Sterling* v. *Constantin*, 287 U.S. 378, 399 (1932)). Applying that standard, the Ninth Circuit determined that the federal government was likely to succeed in showing that the President "had a colorable basis for invoking § 12406(3)" to federalize members of the California National Guard in June in response to similar mob violence against DHS officers in Los Angeles. *Id.*

at 1052.  The Seventh Circuit here "agree[d] with the Ninth Circuit" that a court may review whether "one of the statutory predicates exists" for federalization and that such review must be deferential, although the Seventh Circuit declined to say "[p]recisely how deferential."  App., *infra*, 96a-97a.

Both courts were mistaken to conclude that a federal court may review the President's judgment at all.  *Martin* forecloses such review, and the subsequent relitigation of this issue in judicial districts across the country demonstrates the ills that *Martin* foretold.  The Ninth Circuit apparently viewed *Martin* as having been qualified by this Court's later decision in *Sterling* v. *Constantin*, *supra*.  See *Newsom*, 141 F.3d at 1050-1051; cf. App., *infra*, 97a (citing *Sterling*).  But *Sterling* only confirms that the President's judgment is not reviewable.  There, a federal court had enjoined a state agency from implementing orders to limit oil production during a boom; the Governor of Texas had declared martial law in parts of the State during the litigation and had responded to the injunction by ordering the state militia to shut down oil wells operating in violation of production limits; and the federal court then enjoined the Governor's orders.  See 287 U.S. at 387-391, 396-397.  This Court upheld the lower court's determination that the Governor's orders establishing production controls were reviewable and were unconstitutional.  *Id.* at 398, 404.

In doing so, however, the Court in *Sterling* emphasized that when "the Executive is appropriately vested with the discretion to determine whether an exigency requiring military aid for that purpose has arisen," the executive's "decision to that effect is conclusive."  287 U.S. at 399.  And the Court attributed that proposition to *Martin*, which it cited and quoted approvingly.  See *ibid.*  The exercise of judicial review in *Sterling* itself did not violate that principle, the Court explained, because the case concerned the lawfulness of the Governor's production controls—not the Gov-

ernor's antecedent decision to call up the militia in the face of what the Governor found to be an insurrection in the State. See *id.* at 401-402 ("Fundamentally, the question here is not of the power of the Governor to proclaim that a state of insurrection, or tumult, or riot, or breach of the peace exists, and that it is necessary to call military force to the aid of the civil power. * * * The question before us is simply with respect to the Governor's attempt to regulate by executive order the lawful use of complainants' properties in the production of oil.").

This case is controlled by *Martin* and its progeny. The plaintiffs attack the President's determination that the circumstances in Illinois warrant federalizing the National Guard—precisely the kind of question that *Martin* held (and *Luther* and *Sterling* confirmed) to be committed exclusively to the President's discretion.

3. If the President's decision to call up members of the National Guard were amenable to judicial review, any such review would need to be highly circumscribed for an additional reason not addressed by the Seventh Circuit in its decision below. The President's determination cannot be challenged under the APA. See *Franklin* v. *Massachusetts*, 505 U.S. 788, 800-801 (1992). The plaintiffs have instead sought to assert a violation of Section 12406 "on an *ultra vires* basis." App., *infra*, 63a n.13. Even assuming *arguendo* that actions of the President could be reviewed on such a basis, cf. *Dalton*, 511 U.S. at 474, this Court has recently reiterated that nonstatutory ultra vires review must be "strictly limited" in order to prevent plaintiffs from circumventing the limitations Congress enacted in the APA and other modern judicial-review statutes, *NRC* v. *Texas*, 605 U.S. 665, 681 (2025). Ultra vires review is available "only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute," and only when the plaintiff otherwise lacks any "meaningful and adequate opportunity for judicial review." *Ibid.*

(citations and emphasis omitted). The Court has thus compared ultra vires review to "a Hail Mary pass" that "rarely succeeds." *Id.* at 681-682 (citation omitted).

### B. The President's Invocation of Section 12406 Was A Lawful Response To Violent Threats To Federal Personnel And Property

Even if the President's determination to call up the Illinois National Guard were subject to review at all, the government is likely to succeed in showing on appeal that the President acted well within the authority vested in him by Section 12406's provisions regarding both inability to execute the laws and the danger of rebellion.

1. The President reasonably determined that recent incidents of violence directed against DHS personnel and facilities in Illinois "impede the execution of the laws of the United States," and that "the regular forces of the United States are not sufficient to ensure the laws of the United States are faithfully executed, including in Chicago." Presidential Memorandum 1. Those judgments fully satisfied the third condition specified in Section 12406. See 10 U.S.C. 12406(3) (authorizing the President to call up the National Guard "[w]henever * * * the President is unable with the regular forces to execute the laws of the United States," and directing that the National Guard may then "execute those laws").

As the President explained in the October 4 memorandum, "[f]ederal facilities in Illinois * * * have come under coordinated assault by violent groups intent on obstructing Federal law enforcement activities." Presidential Memorandum 1. Federal officers in the Chicago area have been repeatedly assaulted and threatened. Hott Decl. ¶¶ 16, 24, 35, 44; Parra Decl. ¶ 24. Agitators have perpetrated coordinated ambushes of federal agents; attacked them with moving vehicles; thrown rocks, bottles, pepper spray, and other objects at them; shot fireworks at them, which can burn and cause blindness and other significant injury when detonated at close range; and

injured and hospitalized them. Hott Decl. ¶¶ 20, 36-37; Parra Decl. ¶¶ 11-16. Rioters have also damaged federal buildings, rammed and vandalized federal vehicles, and blocked federal officers from entering or exiting the Broadview facility. Hott Decl. ¶¶ 13, 31-36; Parra Decl. ¶¶ 12-16. An alleged leader of the Latin Kings gang in Chicago is being prosecuted for placing a bounty of $10,000 on the murder of a Border Patrol Chief. Hott Decl. ¶¶ 24; Parra Decl. ¶ 17. These activities substantially interfere with DHS's ability to enforce federal immigration laws in the Chicago area. See, *e.g.*, Hott Decl. ¶¶ 43-47, 63. And it was clearly erroneous for the district court to discredit or minimize the unrebutted sworn testimony that those acts of violence and threats of violence in fact occurred. See pp. 37-38, *infra*.

The President was well within his authority to determine that those repeated acts of violence warrant invoking Section 12406. Violence and the threat of violence have both directly impeded DHS enforcement operations and forced DHS to divert officers and resources away from law enforcement activities and towards the protection of federal buildings and personnel. To be sure, federal officers and agents have continued to attempt to accomplish their duties to the best of their ability in the face of coordinated violence and obstructive crowds. But the relevant legal standard is not whether, "[s]tatistically speaking," immigration enforcement figures are now greater than they were a year ago, as the district court observed. App., *infra*, 23a; see *id.* at 23a-24a (finding the preconditions in Section 12406(3) unmet because "[d]eportations are up, arrests are up, processing at Broadview is up," and "[t]he courthouse remains open"). Immigration enforcement in Chicago would be far more effective if DHS were not facing coordinated, prolonged, violent assault.

Contrary to the district court's view, Section 12406(3) cannot plausibly be read to mean that, so long as *some* amount of execution of the laws remains possible, the

statute cannot be invoked, regardless of how much execution of the laws remains thwarted or how much danger federal personnel face during their constrained operations. As the Ninth Circuit correctly held in *Newsom*, Section 12406(3) does not require the President to be "completely precluded from executing the relevant laws" before he may call up the National Guard. 141 F.4th at 1051. To read the statute in that way would render Section 12406(3) a virtual nullity, in contravention of the "'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute.'" *Parker Drilling Mgmt. Servs., Ltd.* v. *Newton*, 587 U.S. 601, 611 (2019) (citation omitted). That reading would also be impossible to square with historical practice, including *inter alia* President Nixon's decision to call up the National Guard in 1970 in response to a postal strike. 35 Fed. Reg. 5003, 5003 (Mar. 24, 1970). That strike was initially localized, some postal employees continued to work, and some mail service continued. See *Nation: The Strike That Stunned the Country*, TIME (Mar. 30, 1970), https://time.com/archive/6875290/nation-the-strike-that-stunned-the-country/. But under the district court's flawed interpretation, the President could not have called up the Guard until delivery of all mail nationwide became completely impossible.

The district court viewed its all-or-nothing construction of Section 12406(3) as supported by dictionaries defining "unable" to mean "[n]ot able." App., *infra*, 68a (citation omitted). The court understood those definitions to connote a "binary approach: ability or not, capability or not." *Ibid.* But "the words of a statute must be read in their context with a view to their place in the overall statutory scheme," *Davis* v. *Michigan Dep't of the Treasury*, 489 U.S. 803, 809 (1989), and the phrase "execut[ing] the laws" lacks any analogous binary connotation, 10 U.S.C. 12406(3). That phrase instead echoes the constitutional language authorizing Congress to provide

for the calling forth of the militia to "execute the Laws of the Union," U.S. Const. Art. I, § 8, Cl. 15, as well as to the President's authority to "take Care that the Laws be faithfully executed," Art. II, § 3.  Consistent with those background authorities and read as a whole, Section 12406(3) authorizes the President to call up the National Guard when he is unable to ensure the faithful execution of federal laws by those who regularly enforce the laws.  He need not wait until all law-execution is impossible.[4]

In its stay opinion, the Seventh Circuit declined to decide whether to adhere to the Ninth Circuit's interpretation of Section 12406(3) in *Newsom* or the district court's implausible construction here, concluding that the government was not likely to satisfy "either standard." App., *infra*, 101a.  But in support of that conclusion, the Seventh Circuit merely repeated the district court's errors—pointing to increased "immigration arrests and deportations * * * in Illinois over the past year" and DHS press releases as evidence that *some* execution of federal immigration law remains possible.  *Ibid.*  To the extent that DHS officers and agents have been able to continue to engage in some enforcement actions in the Chicago area, the President was entitled to conclude that much enforcement has been thwarted, and that what remains has come at an unacceptable risk to the safety of federal officers.  And it stands to reason that federal immigration authorities' ability to engage in vigorous enforcement of existing laws is greatly impeded if they must do so in the midst of a climate of violent mass resistance.  They could do more—and the President is entitled to direct and

---

[4]  The district court also suggested that the statute's reference to the "regular forces," 10 U.S.C. 12406(3), means exclusively the "soldiers and officers regularly enlisted with the Army and Navy."  App., *infra*, 68a.  Even the plaintiffs, however, accept that the "'regular forces'" include "federal law and enforcement agencies of a *nonmilitary* nature."  C.A. App. A345 (emphasis added) (hearing transcript); see *id.* at A345-A347.  That reading follows from the plain text, which refers to the "regular forces" who are engaged in "execut[ing] the law"—a description that naturally refers to federal law enforcement personnel.  10 U.S.C. 12406(3).  Military forces, in contrast, do not regularly "execute the law."  See 18 U.S.C. 1385.

expect them to do more—in the absence of ongoing threats to their safety.

Moreover, the plaintiffs and the lower courts err in focusing exclusively on the ability of federal authorities to detain and remove illegal aliens. Other federal laws are relevant as well, including the laws forbidding interference with federal functions and assaults on federal officers and property. See, *e.g.*, 18 U.S.C. 111, 1361. The President was entitled to conclude that federalization of the National Guard was necessary to ensure adequate federal forces to faithfully execute those laws as well.

2. The President's action under Section 12406 was independently warranted under the provision authorizing him to call the National Guard into federal service when "there is a rebellion or danger of a rebellion against the authority of the Government of the United States." 10 U.S.C. 12406(2).

The district court understood the term "rebellion" to "mean a deliberate, organized resistance, openly and avowedly opposing the laws and authority of the government as a whole by means of armed opposition and violence," App., *infra*, 66a (citation omitted), and the court of appeals "substantially agree[d]," *id.* at 99a. Under that approach, anything short of civil war is unlikely to clear the "very high threshold" that the lower courts perceived. *Id.* at 66a. Indeed, the district court queried: "Are we, then, in danger of something akin to another Civil War?" *Ibid.*

As a matter of both plain English and history, however, the term "rebellion" encompasses other forms of violent resistance to lawful authority, including to the enforcement of particular laws. See *Black's Law Dictionary* 1522 (12th ed. 2024) (defining "rebellion" to include "[o]pen resistance or opposition to an authority or tradition" and "[d]isobedience of a legal command or summons," in addition to "[o]pen, organized, and armed resistance to an established government or ruler; esp., an organized attempt to change the government or leader of a country, usu[ally] through

32

violence"). The same understanding prevailed in 1903, when Congress enacted the precursor to what is now Section 12406. See Act of Jan. 21, 1903, ch. 196, § 4, 32 Stat. 775, 776 (authorizing the President to call forth the state militias in the case of, among other things, "rebellion against the authority of the Government of the United States"). Dictionaries from that era defined "rebellion" to focus on deliberate resistance to the government's laws and authority. See *Black's Law Dictionary* 999 (1st ed. 1891) ("Deliberate, organized resistance, by force and arms, to the laws or operations of the government, committed by a subject."); *An American Dictionary of the English Language* 916 (1897) ("Open resistance to lawful authority."); *The Cyclopedic Dictionary of Law* 773 (1901) ("forcible opposition and resistance to the laws and process lawfully issued"); *Webster's International Dictionary of the English Language* 1196 (1907) ("Open resistance to, or defiance of, lawful authority.").

Congress plainly had that broad definition in mind when enacting Section 12406 and its antecedents, because it was aware of numerous instances in which the President called the militia into federal service to address open defiance of federal authority in situations that fell short of organized efforts to overthrow "the federal government as a whole." App., *infra*, 67a. Most famously, President Washington called up the militia to assist in suppressing the Whiskey Rebellion—a violent protest in western Pennsylvania against the collection of a federal excise tax. See, *e.g.*, Cong. Research Serv., R42659, *The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law* 8 (Nov. 6, 2018) (CRS Report). To be sure, President Washington took that action under a 1792 statute that did not by its terms refer to "rebellion." See *id.* at 7-8 & n.40; Act of May 2, 1792, ch. 28, §§ 1-2, 1 Stat. 264. But when Congress later enacted statutes referring to a "rebellion," those statutes extended to cover this original historical precedent of violent opposition limited to

particular federal laws—precisely what is occurring here.

The Whiskey Rebellion is emblematic of the range of civil disorders that members of the militia and other federal military forces have long been called upon to address, including use of the National Guard to ensure the enforcement of federal civil-rights laws in the 1960s. See CRS Report 9-23, 34-42. The plaintiffs fail to square their narrow interpretation of "rebellion" with the prevailing historical understanding of the appropriate role of the Armed Forces in quelling domestic upheavals.

The events around Chicago exhibit many of the same features as these historical precedents—violent and forceful opposition to the lawful authority of the federal government in its enforcement of particular federal laws. Like the district court, the court of appeals largely ignored that evidence. The court of appeals recognized that "incidents of unlawful activity or even violence" have occurred and that Illinois has been the site of "violent actions [by] demonstrators in protest of the federal government's immigration policies and actions," but it sought to dismiss the violence as "isolated" or merely "occasional[]." App., *infra*, 99a. The record does not bear out those characterizations. See pp. 8-11, *supra*.

Moreover, the statutory text makes clear that Section 12406(2) empowers the President to act when there is a "danger of a rebellion," even if a "rebellion" has not yet materialized. 10 U.S.C. 12406(2). The President had ample basis to find that the danger of a rebellion was present. In response to lawful immigration enforcement efforts, agitators have specifically targeted federal property and officials with violence, intimidation, and threats—and, if it were required, there is ample evidence of orchestrated and coordinated attacks, going well beyond merely spontaneous outbursts. To the extent the district court believed that the President was required to make some form of express written declaration of a "rebellion brewing" in Illinois

before relying on Section 12406(2), the court was mistaken. App., *infra*, 67a. Nothing in Section 12406 requires such a written finding, and the court identified no other provision purporting to require one. And in any event, when the President first called up the National Guard in response to violence in Los Angeles, he made clear his view that "[t]o the extent that protests or acts of violence directly inhibit the execution of the laws, they constitute a form of rebellion against the authority of the Government of the United States." June 7 Memorandum 1. Neither the plaintiffs nor the lower courts identified any reason to question that the President continues to adhere to that view with respect to the violence in Illinois. Cf. *Trump* v. *Hawaii*, 585 U.S. 667, 702-704 (2018) (declining to second-guess the President's judgment and stressing that judicial inquiry into "matters of  *  *  *  national security is highly constrained").

## II.  THE OTHER FACTORS SUPPORT RELIEF FROM THE DISTRICT COURT'S ORDER

In deciding whether to grant emergency relief, this Court also considers whether the underlying issues warrant its review; whether the applicant likely faces irreparable harm; and, in close cases, the balance of equities. See *Hollingsworth*, 558 U.S. at 190. Those factors all support relief here.

### A.  The Issues Raised By The Order Warrant Certiorari

The issues raised by the district court's order would plainly warrant further review by this Court if that order were ultimately affirmed by the Seventh Circuit. Whether a district court may second-guess the President's decision to call up the National Guard in the face of widespread violent resistance to the enforcement of federal law under his express authority in Section 12406 is a question of tremendous national importance—both in general and in the particular circumstances here, where the President has invoked Section 12406 to protect federal personnel and property from

violent riots in a major American city. This Court regularly grants review to address injunctions that frustrate important Presidential orders and undermine national security. See *Egan*, 484 U.S. at 520 (explaining that the Court granted certiorari to address interference with Executive Branch determinations of "importance * * * to national security concerns"); see also, *e.g.*, *Trump* v. *V.O.S. Selections, Inc.*, cert. granted, No. 25-250 (oral argument scheduled for Nov. 5, 2025); *Hawaii*, 585 U.S. at 710-711; *Winter* v. *NRDC, Inc.*, 555 U.S. 7, 20 (2008).

In addition, as discussed above, the Seventh Circuit's refusal to grant a full stay of the district court's order conflicts in key respects with the Ninth Circuit's decision in *Newsom*. The scope of the President's authority under Section 12406 to federalize members of a State National Guard to respond to violent efforts to obstruct the enforcement of federal immigration law is an important question of federal law, and the answer to that question should be uniform throughout the Nation.

**B.    The District Court's Order Causes Irreparable Harm To The Executive Branch And Threatens The Safety Of Federal Law Enforcement**

The district court's order—and the court of appeals' partial stay of that order—cause irreparable harm to the Executive Branch by countermanding the President's authority as Commander in Chief, jeopardizing the lives and safety of DHS officers, and preventing the President and the Secretary of War from taking reasonable and lawful measures to protect federal personnel from the violent resistance that has persisted in the Chicago area for several months. As this Court recently reiterated, the President "must 'take Care that the Laws be faithfully executed,'" and he "bears responsibility for the actions" of his subordinates in the Executive Branch. *Trump* v. *United States*, 603 U.S. 593, 607 (2024) (quoting U.S. Const. Art. II, § 3); cf. *Free Enter. Fund* v. *Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010) ('The

Constitution requires that a President chosen by the entire Nation oversee the execution of the laws."). The President's authority to fulfill his constitutional mandate would be seriously undermined if courts could second-guess his judgments about whether to call up the National Guard under Section 12406.

The partial stay granted by the court of appeals is not enough to protect federal interests during the ongoing litigation. The court of appeals granted a stay of the district court's October 9 order only to the extent that the order "enjoined the federalization of the National Guard * * * within Illinois." App., *infra*, 85a; see *id.* at 103a. The partial stay will ensure that the Guardsmen remain under federal command. But it will do nothing to ensure the safety of the federal personnel and property that the Guardsmen were called up to protect. Indeed, the Seventh Circuit's partial stay continues to nullify the chief purpose of the President's order—the use of the National Guard in a protective mission to quell violence against federal agents and protect federal property.

The protective mission for which the President federalized the National Guard was and remains plainly warranted by the facts on the ground. There were multiple documented instances of violence or attempted violence against federal officials before the President's order, and the threat of violence remains significant. These include life-threatening ambushes and attacks that are plainly coordinated and preplanned. For example, on October 4, 2025, approximately ten civilian vehicles suddenly boxed in a CBP government-owned vehicle driven by and carrying federal law enforcement personnel. During the ensuing attack, the attackers drove a vehicle at a federal officer on foot, compelling her to fire her service weapon in self-defense. Hott Decl. ¶ 20. The besieged federal officers were surrounded after the shooting by a crowd of approximately 200 rioters, and the Chicago police took more than an hour

to respond (after initially refusing to do so at all). *Ibid.* Deputy Chief Patrol Agent Daniel Parra averred in his declaration that, in more than two decades of service in the Border Patrol, including many years on the U.S.-Mexican border, he had "[n]ever before * * * witnessed" such a coordinated assault on law enforcement vehicles. Parra Decl. ¶ 22; see *id.* ¶¶ 2-3. Nor had he ever before "seen a bounty placed on a law enforcement officer simply for enforcing immigration law." *Id.* ¶ 22. The violence in Chicago is "quickly eclipsing the violence experienced in Los Angeles," *ibid.*, and the district court's order threatens to exacerbate and prolong that violence.

At the moment, federal officers must choose whether, and to what degree, to dedicate resources to securing both their personnel and property from actual and threatened violent attacks, which necessarily diverts resources from their law enforcement mission. The National Guard's deployment would protect lives and federal property, deter acts of violence, free up resources for actual law enforcement, and assist federal law enforcement in carrying out their duties effectively—as occurred in Los Angeles, after the Ninth Circuit stayed unlawful orders enjoining the President's federalization of the California National Guard. See *Newsom*, 141 F.4th at 1054.

The district court downplayed the federal government's urgent safety concerns and discounted affidavits from senior federal law enforcement officers as not "reliable" or as suffering from "bias and lack of objectivity." App., *infra*, 43a-44a. But the court's stated reasons for giving credence to the plaintiffs' rose-tinted assessment of the facts on the ground do not withstand scrutiny. For example, the court noted that federal grand juries have apparently declined to return indictments against three individuals arrested after recent incidents at the Broadview facility discussed by the federal government's declarants. *Ibid.* None of the declarants said otherwise. Moreover, in the current climate of hostility to federal law enforcement in Chicago—stoked

by local political leaders, including the Governor and the Mayor—a grand jury's decision not to indict a person accused of assaulting a federal officer is hardly proof that the assault did not occur. In any event, focusing on three individuals loses the forest for the trees. The court elsewhere acknowledged the indisputable fact that "there have been * * * assaults on federal agents." *Id.* at 43a. The plaintiffs have likewise acknowledged, but sought to downplay, the ongoing violence and threats to federal law enforcement. See, *e.g.*, Gov't C.A. Mot. 18 (collecting citations).

The plaintiffs can offer no reliable assurance that state or local authorities will be sufficient to fill the security void that the injunction creates. State and local inaction has already resulted in threats and injuries to federal personnel, which has hindered the federal government's ability to safely carry out its mandates. The injunction should be stayed so that federal enforcement of federal immigration law in Chicago is not left to the mercy of hostile state and local officials—or violent mobs.

## C. The Balance Of Equities Weighs Strongly In Favor Of The Federal Government

The balance of the equities also weighs strongly in favor of the government. Against the public-safety threats to federal personnel detailed above, the plaintiffs' claimed harms are speculative and unsubstantiated. The plaintiffs have not identified any concrete or specific harm that will flow to the State of Illinois or the City of Chicago if the injunction is stayed pending appeal and certiorari. And that is especially so since the Seventh Circuit already stayed the injunction against federalization of the Illinois Guardsmen, App., *infra*, 102a-103a, thus depriving the State of those resources regardless. Indeed, it is difficult to imagine how deploying the National Guard to protect federal personnel and property, rather than leaving them federalized but non-deployable, could cause irreparable harm to anyone.

The district court stated that, in the absence of an injunction, the plaintiffs would suffer irreparable harm to their sovereignty in light of the court's earlier conclusion that the federalization of the National Guard "likely violate[d] the Tenth Amendment" and circuit precedent treating a "'continuing constitutional violation'" as per se irreparable. App., *infra*, 82a (citation omitted). But the court's Tenth Amendment conclusion was entirely derivative of its flawed understanding of Section 12406 itself. See *id.* at 81a (district court's statement that the Tenth Amendment claim "rise[s] and fall[s] with Plaintiffs' [Section] 12406 claim"); *id.* at 100a-101a (court of appeals' agreement that "the Tenth Amendment question rises and falls with the statutory claim"). The plaintiffs' claim is therefore fundamentally statutory, not constitutional, and alleged violations of a federal statute do not give rise to any presumption of irreparable harm. Nor can the plaintiffs show irreparable harm from the deployment of "National Guard members from Texas." *Id.* at 82a. Any suggestion that the deployment somehow "empowers Texas at the expense of Illinois" is incorrect. *Ibid.* The relevant members of the Texas National Guard have been called into active federal service. See Nordhaus Decl. ¶ 23. Accordingly, those Guardsmen are deploying to Illinois in their capacity as members of the Armed Forces of the United States, under the command of the President—not the Governor of Texas.

Finally, the district court's speculation that "deployment of National Guard members is likely to lead to civil unrest," App., *infra*, 82a, cannot tip the balance of equities in the plaintiffs' favor. Under the statute and the Constitution, such determinations lie with the President as Commander in Chief, not the district court. Nor does equity support creating a kind of rioters' veto, under which the possibility of unlawful violence directed against the National Guard could be a basis to enjoin the lawful activation and deployment of the Guard. In any event, the court's predictions

of how violent rioters will react to the presence of organized, lawful, armed force are implausible. Like other criminal elements, they will be deterred, not encouraged, by strength. Similar predictions by California officials were proven wrong in practice, and there is no reason to doubt that the situation in Illinois will be any different. Members of the National Guard receive appropriate training for their protective mission, and they are fully capable of being trusted to defend federal personnel and property without "add[ing] fuel to the fire." *Id.* at 83a; see Knell Decl. ¶ 8.

## III.   THE COURT SHOULD GRANT AN IMMEDIATE ADMINISTRATIVE STAY

The Solicitor General respectfully requests that this Court grant an immediate administrative stay while it considers applicants' submission. Federal officials and federal property are the central targets of the violence that has roiled the Chicago area in recent weeks. An immediate administrative stay would allow the Armed Forces to provide the protection that the President has directed. Were the injunction allowed to remain in effect, even just for the period while this Court considers the stay application, that would immediately increase the risk that federal personnel in Chicago may be seriously harmed by violent anti-ICE agitators.

CONCLUSION

This Court should stay the district court's order of October 9, 2025. In addition, the Solicitor General respectfully requests an immediate administrative stay of the district court's order pending the Court's consideration of this application.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

OCTOBER 2025