IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 25 CR 636 |
| v. | Judge Georgia N. Alexakis |
| MARIMAR MARTINEZ, | |
| Defendant. | |

**MARIMAR MARTINEZ'S REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO MODIFY THE COURT'S PROTECTIVE ORDER**

*"Charles Exum sought to assassinate you, and then DHS sought to assassinate your character. That is unconscionable and intolerable."*

-United States Senator Richard Blumenthal.[1]

At last week's hearing on Marimar Martinez's Motion to Modify the Protective Order this Court peppered counsel for the Government with questions as to whether the U.S. Attorney's Office has done anything to have DHS either retract prior false statements about Ms. Martinez, or at least publicly acknowledge that charges have been dropped against the Montessori school teacher they continue to falsely brand as a "domestic terrorist."

The Government offered half-hearted responses ranging from these tweets and press releases *may* be considered "government records" and they are unsure of

---

[1] February 3, 2026, Bicameral Public Forum to Receive Testimony on the Violent Tactics and Disproportionate Use of Force by Agents of the Department of Homeland Security (DHS).

1

that import, to the claiming that the Government is not technologically sophisticated enough to know how to remove a tweet from X.[2]

Regardless of what the Government told this Court last week, DHS has since made clear they have no intention of stopping their campaign of misinformation against Marimar Martinez. Reporters from National Public Radio (NPR) were able to do what the U.S. Attorney's Office has seemingly been unable or unwilling to do and directly asked DHS on January 30, 2026, the day after this Court's inquiries to the Government, "if the agency plans to take down or update their online statements given that charges against Martinez have been dropped."[3]

DHS gave this Court the answer Government's counsel could not at last week's hearing and has done more than enough to demonstrate "good cause" for Ms. Martinez's need to modify the protective order in this case. DHS stated:

> Border Patrol law enforcement officers were ambushed by domestic terrorists that rammed federal agents with their vehicles. The woman, Marimar Martinez, driving one of the vehicles, was armed with a semi-automatic weapon and has a history of doxing federal agents.

*Id.*

To avoid any potential confusion about DHS's position here, the Chicago Sun Times also picked up the football on behalf of the U.S. Attorney's Office and directly contacted DHS on February 2, 2026, regarding its false claims against Marimar

---

[2] To the extent this is the actual issue, counsel for Ms. Martinez will volunteer his time to work with the FBI and DHS to remove their prior defamatory tweets. To the extent they don't want to inconvenience me they simply can navigate on their X page to the original false tweet (for clarity purposes we are only referring to the tweets about Marimar Martinez), click/tap the three-dot menu icon (…) on the top right of the tweet, and select "Delete." There all also a plethora of YouTube videos that can be accessed if they run into issues.
[3] https://www.npr.org/2026/01/31/nx-s1-5690124/ice-alex-pretti-immigration-unproven-claims-dhs-enforcement-arrests. (last accessed February 5, 2026).

Martinez. DHS stated once again, it "stands by our press releases and statements. The facts of what happened did not change."[4]

After bringing these most recent statements by DHS to the federal prosecutors in this case in the hopes of reaching a compromise, the U.S. Attorney's Office has failed to act. While a federal prosecutor has a duty to inform the Court when she knows a government witness is lying on the witness stand, so too should that duty extend to when its client is making false claims to the press that the Office knows to be untrue.

Ms. Martinez is a U.S. citizen with no criminal history who has spent her entire life living in Chicago which is part of the Northern District of Illinois. The U.S. Attorney's Office for the Northern District of Illinois represents her as much as anyone. Yet here, DHS continues to repeat false statements about Ms. Martinez as the U.S. Attorney's Office turns a blind eye. They are no longer passive observers to the false statements made by DHS; they are active enablers of an out-of-control client. The U. S. Attorney's Office knows the following: (1) Ms. Martinez is not a domestic terrorist, (2) she never rammed the agents' vehicle, (3) she never doxed agents calling for violence to ICE agents; (4) she never boxed in the agents; (5) the agents were never 'trapped' inside their vehicle and (6) she never drove at Agent Exum in her vehicle. There is no reason for them to not be compelled to provide evidence confirming these

---

[4] https://chicago.suntimes.com/immigration/2026/02/03/marimar-martinez-shot-border-patrol-chicago-speaks-out-after-good-pretti-deaths-i-am-their-voice (last accessed February 5, 2026).

3

truths, or at the very least allowing Ms. Martinez to demonstrate the falsity of these claims.

### I. DHS's Continuous Defamation of Ms. Martinez as a "Domestic Terrorist" Has Created "Good Cause" for this Court to Authorize the Release of all Discovery in this Case.

The Government has seemingly abandoned all former justifications it made to this Court regarding its opposition to the motions to modify the protective order. Despite initially hanging its hat on the open criminal investigation into Charles Exum, it now drops a footnote stating, it "does not now rely on its [the open criminal investigation] existence to justify its opposition to Ms. Martinez's instant motion." (R. 105, at fn 2).

Rather, the Government's entire argument is now focused on whether the "good cause" prong of the analysis detailed in Ms. Martinez's Motion to Modify the Protective Order is met. *Id*. at 7. Marimar Martinez submits that DHS's statements detailed above, that they will not retract any prior press releases or statements made about Marimar Martinez and the even bolder statement that they will "stand[] by our press releases and statements," provides ample good cause for this Court to modify the order. Because if the U.S. Attorney's Office will not correct its own client's misstatements to the public, it is left entirely to Ms. Martinez to do so on her own. In order to do that effectively, she needs to be able to reference all of the discovery tendered in her now dismissed case.

One crystal clear example of why *all* the discovery in this case needs to be released to combat this campaign of lies by DHS against Ms. Martinez is an

4

examination of just one of the many statements made by DHS Assistant Secretary Tricia McLaughlin about Marimar Martinez. Remember, as stated above, DHS stands by all their former statements and press releases.

On October 4, 2025, the day Marimar was shot by Agent Exum, Assistant Secretary Tricia McLaughlin used her official Government X account to put out to the world the following misinformation about Marimar Martinez. (Ex. A). This statement, which is one of the statements DHS continues to stand behind, is still on Ms. McLaughlin's X account and to date has 5.2 million views.

The statement is almost completely false. First, she stated as fact that "officers were rammed by vehicles and boxed in by 10 cars." *Id*. This statement is objectively false as there were only two vehicles involved in this incident, and the agent's vehicle was never "boxed in."

This same statement that DHS (and presumably the U.S. Attorney's Office) stands by falsely claims, "[a]gents were unable to move their vehicles and exited the car." *Id*. Again, this statement is completely false and simply an attempt by the government to justify Agent Exum's decision to exit his vehicle and, within *two seconds,* unload five rounds of ammunition into Ms. Martinez's body. The discovery in this case conclusively demonstrates that the agents were fully able (the exact opposite of "unable") to move their car at any point. There was not a single car in front of them for hundreds of yards. Rather, they chose to exit their vehicle and open fire on Ms. Martinez—it is a miracle she did not suffer the same fate as Renee Good, Alex Pretti, and Silverio Villegas Gonzalez.

A third false statement by the Assistant Secretary of DHS states, "The armed woman was named in a @CBP intelligence bulletin last week for doxing agents and posting online 'Hey to all my gang let's fuck those mother fuckers up, don't let them take anyone.'" *Id.*[5] Once again, the U.S. Attorney's Office knows full well Marimar Martinez has no history of doxing agents and certainly never posted this above statement online. Yet it sits idly by while its client, and sister agency in the Government, spews lies about a citizen in the District it is charged with protecting.

For the first time since October 4, 2025, and only after being called to the carpet by this Court, the Government seems to indicate its willingness to now release *some* of the discovery produced in this case but not all.[6]

**1. Agent Exum's Text Messages.**

The Government opposes the release of Agent Exum's text messages out of concern it may "sully" Mr. Exum's reputation.[7] The irony that the same government who continues to defame Ms. Martinez and other protestors, many of whom they have killed, is now worried about sullying the reputation of a border patrol agent who is under investigation for potential unlawful actions is shocking.

---

[5] The DHS statement also erroneously claims that Ms. Martinez "drove herself to the hospital to get care for her wounds" which is also inaccurate as the Government knows Ms. Martinez called 911 and was transported to the hospital by ambulance.

[6] Counsel for Ms. Martinez met with counsel for the government for multiple hours in an attempt to reach a consensus on these disclosure issues. In the hopes of obtaining the most critical information to combat the DHS lies, counsel agreed not to seek disclosure of specific discovery. Based on the rejection of this compromise and the Government's 1:30a.m. filing, Ms. Martinez is now seeking the publication of all of the discovery tendered in this case for the reasons stated above.

[7] To the extent there are concerns about the privacy interests of the recipients of these messages, counsel has informed the Government we have no objection to full redactions and non-attribution of relationship status to the recipient.

Agent Exum sent these messages in the minutes, hours, and days after the shooting. These are his words. To the extent they would "sully" his reputation more than his previously disclosed disgusting text messages already have, it is a fully deserved self-imposed sullying. Marimar Martinez had no say in being branded as a "domestic terrorist" by her government. The Government drafted those words. The Government sent those words out to the world. Unlike Exum, she never had a say in the things being written about her, as opposed to Exum having had full say in the things he chose to write and disseminate.

Additional good cause exists for the release of the other text messages. Marimar Martinez's shooting was one in a pattern of unprecedented Government misconduct in our country's history. The executions of Ms. Renee Good and Mr. Alex Pretti are what motivated the filing of this Motion to Modify the Protective Order. After DHS Agents murdered Ms. Good and Mr. Pretti, the Government made the same immediate statements about Ms. Good and Mr. Pretti as they did about Ms. Martinez. They branded this protestors as "domestic terrorists" within minutes of the incidents without any actual investigation of the facts.

The currently sealed Exum text messages and emails refute the public statements by the Government about what happens after one of these DHS shootings, and the American people have the right to see how our leaders are interacting with these Agents in the minutes and hours of the aftermath of one of these shootings. Marimar knows by viewing these texts and emails why the killings in Minneapolis were almost inevitable, and why they will no doubt continue until the American

7

people stand up and say enough is enough. These texts messages need to be viewed by the country now more than ever.[8]

Another reason demonstrating good cause to modify the protective order and release the text messages is that Ms. Martinez continues to be branded as a "domestic terrorist" by her own Government. These false claims rest squarely on Agent Exum's false narrative of events. These text messages completely undermine his credibility regarding what happened on October 4 and by destroying Agent Exum's credibility regarding his description of the events that day, Ms. Martinez also topples DHS's false domestic terrorist label at the same time. Exum's messages contain his statements of the events that the U.S. Attorney's Office knows is belied by the evidence in this case. To attempt to withhold these messages the U.S. Attorney's Office is failing in its duty to always "do the right thing."

The Government seemingly acknowledges that regardless of the protective order in this case it had a duty to disclose these text messages to the defense. The Government claims they were at least required to be disclosed under the Jencks Act after Agent Exum testified in the evidentiary hearing based on the spoliation of evidence claim. In addition to their required disclosure under Jencks, Ms. Martinez's position is that these text messages were also discoverable pursuant to the Government's obligations imposed by Magistrate Judge McShain's Rule 5(f) order

---

[8] To further illustrate just how valuable it is for the American people to see these text messages, at this week's Bicameral Public Forum to Receive Testimony on the Violent Tactics and Disproportionate Use of Force by Agents of DHS, multiple members of Congress used the previously disclosed Exum texts as examples of why Congress must act now to change the way DHS is acting in our communities. These additional texts and emails will certainly further compel members of Congress to step up and insist on changes with the way our DHS agents and officials are interacting with the people they are here to protect.

which required the prompt disclosure of both exculpatory and impeachment information (R. 4), as well as this Court's direct order requiring the disclosure of some of these messages "promptly" to the defense (R. 65). Many of the messages were also required to be disclosed pursuant to *Giglio* as they are impeachment evidence of Agent Exum. In fact, the Government's failure to disclose Exum's text messages the Court ordered disclosed on November 17, 2025, at the conclusion of Exum's testimony would have most likely led to a motion by the defense seeking a discovery violation finding had this case not been dismissed. Regardless, whether under *Brady, Giglio, Jencks,* or a direct order of this Court, these messages were discoverable and the protective order had no bearing in their ultimate disclosure.

### 2. Flock and LPR Cameras

Instead of using its time to get DHS to retract their prior false statements and stop making defamatory statements going forward, the Government instead focuses on protecting alleged law enforcement sensitive data from being released into the public domain. Once again, the Government misses the point on why Ms. Martinez wants the Flock and LPR Camera data released. She has no interest in compromising law enforcement techniques. Rather, her sole interest remains in fighting back against the claims the Government continues to make that she is a domestic terrorist.

If the U.S. Attorney's Office would simply get their client to acknowledge the truth, that she is not a domestic terrorist, we would not need to reveal this sensitive law enforcement information to the public. But they have refused to do that to date. They continue to allege that this encounter was part of a "carefully orchestrated

9

ambush" by Ms. Martinez, despite the federal prosecutors knowing there was no coordination in this encounter.

Law enforcement obtained 30 days of Flock camera images of Marimar's car all over the City of Chicago presumably to support their "domestic terrorist" allegation. They presumably wanted to be able to show her driving from the dynamite factory on Cicero to the suicide vest store on Armitage. Instead they presumably noticed her driving to Target for school supplies and Michael's for crafting materials for her students.

When the government refuses to back down from falsely labeling a U.S. citizen as a domestic terrorist, they put at issue their entire investigation of that individual which completely failed to turn up anything to support the false allegation. Ms. Martinez is forced to ask for the entire investigation and its lack of evidence to be disclosed to clear her name. Such is the good cause basis for the release of this information. We will drop this request to release Flock data if DHS issues a retraction acknowledging Ms. Martinez is not a domestic terrorist.

As for the LPR data, Ms. Martinez acknowledges it does not have to do with her and is focused on other vehicles on Kedzie Avenue that morning. But again, that is the point. The Government sought to identify coconspirators in what they falsely claim was a "carefully orchestrated ambush" but again came up empty. It is the fact that the Government used all its law enforcement techniques to prove up their "domestic terrorist" label and came up empty at every turn that is relevant. The only

way to battle a false allegation in this case is to show the public all the work the Government did and how they came up empty-handed.

## II. This Court is Not Divested of Jurisdiction Based on The Third Party Intervenors Notice of Appeal.

In another flip flop of the Government's position since last week, the Government now attempts to again prevent the public from seeing the truth about this case by making a last-ditch jurisdiction argument. Despite agreeing that this Court has jurisdiction to hear this motion and telling the Court just seven days ago that "because this is a party now seeking to modify the protective order, that this is separate and distinct from the issue that's in front of the appellate court with respect to the intervenor's motion." (R. 104, at 21), the Government now attempts to stop this Court's review of the matter. The Government's argument fails.

Ms. Martinez's motion to modify the protective order is separate and distinct from the third party intervenor's attempt to intervene in a case that has previously been dismissed. Filing a notice of appeal divests the district court of jurisdiction *only* over those aspects of the case involved in the appeal. *Griggs v. Provident Consumer Discount* Co., 459 U.S. 56, 58 (1982); *United States v. Ali*, 619 F.3d 713, 722 (7th Cir. 2010); *Kusay v. United States*, 62 F.3d 192, 193-94 (7th Cir. 1995); *Ced's Inc. v. EPA* 745 F.2d 1092, 1095-96 (7th Cir. 1984).

The notice of appeal filed in this case is by proposed third party intervenors which relates only to whether their emergency motion to intervene should have been granted. That issue is separate and distinct from Ms. Martinez's motion here, as one of the two parties to the actual protective order, to use the provisions contemplated

11

in the protective order and seek to amend it as is her right. Moreover, as this Court previously noted, the granting of Ms. Martinez's motion here would not necessarily obviate or moot the third-party intervenor's appeal because she would not be required to turn over all the materials to the proposed intervenors.

## Conclusion

On February 24, 2026, Marimar Martinez is scheduled to return to Washington D.C. as a guest of Congressman Jesus "Chuy" Garcia to attend President Trump's State of the Union Address to Congress. Presumably, DHS Secretary Kristi Noem will be present. Perhaps former Commander of the Border Patrol Gregory Bovino will also be present. There is no doubt that between now and February 24, 2026, DHS will continue to defame Marimar and continue to brand her as a "domestic terrorist."

Ms. Martinez humbly asks this Court to lift the protective order in this case so no longer will DHS be allowed to be the sole narrator of the events of October 4, 2025, and to allow the public to see what we already know—that Marimar Martinez was the victim of an out-of-control Border Patrol Agent who was immediately embraced by this Administration and protected from any scrutiny for his unlawful actions.

Respectfully Submitted,

/s/ Christopher V. Parente
Christopher V. Parente

**Cheronis & Parente**
140 South Dearborn Street, Suite 404
Chicago, Illinois 60603
(312) 663-4644
cparente@cheronislaw.com